**Walter WINSTON and Corrine Cummings, on their own behalf and on behalf of all others similarly situated, Plaintiffs-Appellants,**

v.

**UNITED STATES POSTAL SERVICE, Benjamin F. Bailar, in his official capacity as Postmaster General, Emmett E. Cooper, Jr., in his official capacity as Postmaster of the Chicago Post Office, American Postal Workers Union, AFL-CIO, Defendants-Appellees.**

No. 78–1149.

United States Court of Appeals, Seventh Circuit.

Argued April 25, 1978.

Decided Sept. 7, 1978.

---

Charles A. Linn, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs-appellants.

Daniel B. Jordan, Washington, D. C., Stephen E. Alpern, U. S. Postal Service, Washington, D. C., for defendants-appellees.

Before FAIRCHILD, Chief Judge, SPRECHER, Circuit Judge, and MILLER, Judge.*

MILLER, Judge.

This appeal is from the district court's memorandum opinion and order of April 13, 1977,[1] holding that the grievance procedures adopted for nonpreference-eligible postal employees by the United States Postal Service ("USPS") and the American Postal Workers Union ("Union") do not violate either the Postal Reorganization Act ("PRA"), Pub.L. No. 91–375, 84 Stat. 731 (codified at 39 U.S.C. §§ 101 *et seq.*) or the due process clause of the Fifth Amendment. We affirm.

---

* The Honorable Jack R. Miller of the United States Court of Customs and Patent Appeals sitting by designation.

1. Judge Alfred Y. Kirkland's opinion is reported at 432 F.Supp. 1117 (N.D.Ill.1977).

## BACKGROUND

Appellants are former employees of USPS[2] and members of the Union; neither was a preference-eligible employee.[3] They were discharged from USPS while covered by the 1973 National Collective Bargaining Agreement ("National Agreement") between USPS and the Union. Article XVI of the National Agreement provided that "[n]o employee may be disciplined or discharged except for just cause." As permitted by 39 U.S.C. § 1206(b),[4] article XV of the National Agreement set forth a series of steps in the grievance procedure which could culminate in binding third-party arbitration.

### The Grievance Proceedings

On July 18, 1973, appellant Winston was given a thirty-day written notice of discharge based upon an allegation that on May 26, 1973, he had "threatened to kill a supervisor who was on duty." In accordance with article XV of the National Agreement, Winston filed a grievance with a representative of the Union. The grievance procedure provided for an employee to be represented by a union representative, who, in this case, was the treasurer of the local union. Step 1 of the grievance procedure consisted of an informal discussion between Winston and his Union representative with his immediate supervisor. The grievance was orally denied on July 19, 1973. Subsequently, a step 2A appeal was filed. On August 2, 1973, the grievance was denied after an informal discussion between Winston and his Union representative with a representative of the Chicago Postmaster.[5]

Winston filed a step 2B appeal which resulted in an "informal hearing on the merits" between the USPS Chicago District Director of Employee and Labor Relations and another Union representative for Winston. At this "hearing," the Postal Inspection Service Investigative Summary was discussed. It consisted of statements of Winston, the supervisor who instituted the charge against him, and four supervisory employees who had witnessed the May 26, 1973, incident. Winston states in this appeal, without contradiction by appellees, that evidence of his witnesses, whose names he had given to the Union representative, was not submitted, that he was not allowed to be present, and that no witnesses were called, interviewed, or subjected to cross-examination. On December 4, 1973, the grievance was again denied.

Pursuant to section 3 of article XV of the National Agreement, Winston requested that the Union demand arbitration of his grievance, but the request was denied.[6]

---

2. Appellant Winston had been a postal clerk for four years at the time of the notice of discharge. Appellant Cummings had been a postal clerk for over twenty-four years. Both were hired by the United States Post Office, and, after serving probationary periods, they were certified to the competitive civil service. Upon the effective date of the PRA in 1971, they became regular, full-time employees of the new USPS.

3. Preference-eligible employees are defined in 5 U.S.C. § 2108(3). Under Title 5 they are granted specified employment and retention preferences, including the right of appeal to the Civil Service Commission ("CSC"). These preferences are extended to USPS employees meeting the preference-eligible definition by 39 U.S.C. § 1005(a)(2).

4. 39 U.S.C. § 1206(b) provides:
   Collective-bargaining agreements between the Postal Service and bargaining representatives recognized under section 1203 may include any procedures for resolution by the parties of grievances and adverse actions arising under the agreement, including procedures culminating in binding third-party arbitration, or the parties may adopt any such procedures by mutual agreement in the event of a dispute.

5. Although Winston was present at both the step 1 and step 2A discussions, he was not allowed to present witnesses on his own behalf or to confront and cross-examine the witnesses against him.

6. Having exhausted the grievance procedure set forth in the National Agreement, Winston appealed to both the CSC and the National Labor Relations Board ("NLRB"). CSC informed Winston that it no longer had jurisdiction over nonpreference-eligible postal employees, and the NLRB issued an opinion finding no evidence of an unfair labor practice.

   CSC Commissioners Robert E. Hampton, Jayne B. Spain, and L. J. Andolsek were also named as defendants in the court below on the

Winston was formally discharged on January 8, 1974.

Appellant Cummings was given a thirty-day notice of discharge on August 30, 1973, based on allegations that she had "misappropriated postal funds in the years 1972 & 1973." She followed the same grievance procedures as Winston, with the same result, and was discharged effective March 1, 1974. Her appeal to CSC was, like Winston's, denied. Cummings states, without contradiction by appellees, that she was denied an opportunity to appear, present evidence, and cross-examine adverse witnesses.

*The District Court Proceedings*

Appellants contended before the district court[7] that the grievance procedure of the National Agreement violated both 39 U.S.C. § 1001(b)[8] and the due process clause of the Fifth Amendment. Specifically, they alleged that they were discharged without an opportunity for a fair hearing, including the right to confront and cross-examine adverse witnesses and to present evidence of their own to rebut the charges against them.

In its order of April 13, 1977, the district court granted summary judgment to USPS and the Union. It concluded that the legislative history of PRA "makes clear that non-preference eligible employees covered by collective bargaining agreements are limited to grievance procedures [under those agreements] in resolving adverse actions." 432 F.Supp. at 1119. It found that 39 U.S.C. § 1005(a)(2) gives preference-eligible employees alternative remedies of (1) appeal to the CSC for a "trial type" hear-

ing, or (2) the collective bargaining agreement procedure. But it found no alternative remedies for nonpreference-eligible employees on the basis that, under 39 U.S.C. § 1005(a)(1), access to the CSC ends when such access would be inconsistent with the "provisions of any collective-bargaining agreement negotiated on behalf of and applicable to them." The court was not persuaded that 39 U.S.C. § 1001 reflects a Congressional intent that a "trial type" hearing be required before dismissal of non-preference-eligible employees.

Addressing the constitutional issue, the district court held that postal workers, as federal employees, have a sufficient property interest in continued employment to entitle them to Fifth Amendment protection, but that "the grievance procedure established by the agreement between USPS and the Union satisfies Due Process." 432 F.Supp. at 1121. Citing the plurality opinion by Mr. Justice Rehnquist in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the court stated:

> Since Congress created the property interest in continued employment in the Act [PRA] and in the same Act set forth the procedure for protection of that interest, this Court may find that employees of USPS were entitled to no Due Process protection beyond that afforded by the collective bargaining agreement . . . .

Nevertheless, the court, assuming that an independent examination of the grievance procedures was required, concluded that

ground that established collective bargaining procedures were invalid, so that nonpreference-eligible postal employees are still subject to CSC jurisdiction. The court dismissed the suit against these defendants, 432 F.Supp. at 1121, and appellants have not appealed this portion of the decision.

7. Earlier the district court had certified this action as a class action, the class consisting of:

    all regular, full-time, non-probationary employees of the U. S. Postal Service, Chicago Regional Office who have been or may be discharged or suspended without being afforded an opportunity for a fair and impartial

hearing with a right to confront and cross-examine witnesses.

8. 39 U.S.C. § 1001(b) provides, in pertinent part:

    The Postal Service shall establish procedures, in accordance with this title, to assure its officers and employees meaningful opportunities for promotion and career development and to assure its officers and employees full protection of their employment rights by guaranteeing them an *opportunity for a fair hearing* on adverse actions, with representatives of their own choosing. [Emphasis added.]

due process does not necessarily include a "trial type" hearing and is satisfied where, as here, the grievance procedures provide: (1) notice to the employees of the pending charges; (2) an opportunity to be heard by presenting grievances through a "representative of their own choosing," i. e., the Union; and (3) authority for the representative to bring further proceedings before a neutral arbiter and to be sued if failure to bring the case to an arbiter "was a breach of duty to fairly represent." [9]

## OPINION

### I. Statutory Interpretation Issue

Relying on 39 U.S.C. § 1001(b), appellants argue that Congress specifically provided for the full protection of their right to be heard on any adverse actions. They also argue that the "fair hearing requirement" of section 1001(b) includes "the rights of confrontation and cross-examination of witnesses, and the right to present evidence, as an alternative to grievance procedures." [10] This is predicated on their contention that the "fair hearing requirement" is not qualified by or subordinate to any grievance procedures negotiated by USPS and the Union through collective bargaining. Nevertheless, we are satisfied that legislative history clearly demonstrates Congressional intent that nonpreference-eligible postal employees who are covered by a collective bargaining agreement are to be limited solely to the grievance procedures of that agreement in appealing adverse actions.

9. The district court found it unnecessary to reach the issue of whether appellants' adoption of the grievance procedures constituted a waiver of their due process claims.

10. Appellants conceded that § 1001(b) does not mandate any particular form of grievance procedure on adverse actions or that every employee must be given the right to demand arbitration.

11. The House-passed bill, H.R. 17070, 91st Cong., 2d Sess. (1970), was approved by the Senate in lieu of the Senate bill, S. 3842, 91st Cong., 2d Sess. (1970). The differences between the bill as passed by the House and the

### Legislative History of PRA

The legislative history of the PRA provides a unique source for determining the intent of Congress underlying its postal reform since, as the House Post Office and Civil Service Committee's report on H.R. 17070 [11] observes: "Rarely has any subject received as much careful and intensive consideration by a committee of the Congress as this committee has given to the very complex and important subject of postal reform." H.R.Rep. No. 91–1104, 91st Cong., 2d Sess. 2, reprinted in [1970] U.S.Code Cong. & Admin.News 3649, 3651 [hereinafter cited as "House Report"].

The first bill to address the subject of postal labor relations with a view to replacing the procedures of traditional government labor relations with those of the private sector was H.R. 4, 91st Cong., 1st Sess. (1969).[12] H.R. 4 kept postal employees within the competitive civil service system (id. § 2125) and gave both individual employees and their union "the right to present and process grievances and to submit to arbitration unresolved grievances" (id. § 3711(b)). Section 3711(c)(3) required the grievance procedures to include "the right to call, question, and cross-examine witnesses." It is this right which appellants argue is contained in 39 U.S.C. § 1001(b).

Later in 1969, a bill was introduced in behalf of the Administration (H.R. 11750, 91st Cong., 1st Sess. (1969)), under which postal employees could be removed from the competitive civil service (id. at § 209). There was no provision for the grievance procedures to include an employee's right to

substitute agreed to in conference, which became Pub.L. No. 91–375 (that is, PRA), are noted in H.R.Rep. No. 91–1363, 91st Cong., 2d Sess. 79, reprinted in [1970] U.S.Code Cong. & Admin.News 3712 [hereinafter cited as "Conference Report"].

12. Subsequent legislative history shows the central purpose of PRA's labor management provisions to be to "bring postal labor relations within the same structure that exists for nationwide enterprises in the private sector." House Report at 13, [1970] U.S.Code Cong. & Admin.News at 3662.

call, question, and examine witnesses.[13] The President's recommendations made clear the intent that nonpreference-eligible employees would have recourse to only the procedures provided under a collective bargaining agreement. House Comm. on Post Office and Civil Service, 91st Cong., 1st Sess., Recommendation of the President of the United States on H.R. 11750, at 152, 160 (Comm. Print 1969). It is to be noted that H.R. 11750 became the model for subsequent bills, amendments, and ultimately the PRA.

Following hearings on these bills, H.R. 4 was reported out of committee;[14] however, the sections pertinent to our analysis had been changed to substantially conform to the sections of H.R. 11750.[15] Under section 209 of the revised H.R. 4, postal employees were not to be covered by other laws relating to federal employees. Section 801(a) required the Postal Service to establish procedures, subject to collective bargaining contracts, "to assure its employees of an opportunity to be heard before adverse actions are to be taken against them." The Lloyd-LaFollette Act (appeal procedures for adverse actions), chapter 75 of title 5, was made applicable *except when there was a collective bargaining agreement in effect.*[16] *See* H.R.Rep. No. 91–988, 91st Cong., 2d Sess. 20–21, 32–33 (1970).

In the aftermath of the March 1970 postal strike, direct negotiations regarding the format of postal reorganization were undertaken between representatives of the President and the unions. Their "Memorandum of Agreement" of April 16, 1970, committed the Administration to "collective bargaining under a statutory framework . . . over *all aspects* of wages, hours, and working conditions *including grievance procedures* [emphasis added]."[17] The President transmitted a new proposed bill, introduced as H.R. 17070, *supra* note 11, in accordance with the Memorandum of Agreement. Section 201(a), in pertinent part, provided:

> The Postal Service shall establish procedures, subject to subchapter II of this title, . . . to assure its employees full protection of their employment rights by guaranteeing them an opportunity for a fair hearing on adverse actions, with representatives of their own choosing. Subject to subsection (b) of this section, the provisions of chapter 75 of title 5 shall apply to employees of the Postal Service except to the extent of any inconsistency with—
>
> (1) the provisions of any collective bargaining agreement negotiated on behalf of and applicable to them, or
>
> (2) procedures established by the Postal Service and approved by the Civil Service Commission.

■ The reference to subchapter II was to the "Employee-Management Relations" portion of the bill which made the National Labor Relations Act applicable to the Postal Service, granted recognition to the unions, and authorized collective bargaining agreements to include procedures for resolution

13. The pertinent section of H.R. 11750 (§ 801(a)) read:

The Postal Service shall establish procedures [by mandatory collective bargaining] . . . to assure its employees of an opportunity to be heard before adverse actions are to be taken against them. Pending the establishment of such procedures, the provisions of chapter 75 of title 5 [Lloyd-LaFollette Act] shall continue to apply to employees of the Postal Service.

Section 801(d) gave preference rights to veterans regardless of the grievance procedures.

14. H.R.Rep. No. 91–988, 91st Cong., 2d Sess. (1970).

15. During preparation of H.R.Rep. No. 91–988, there was a postal strike. This "postal work

stoppage" of March 1970 was subsequently described as the genesis of H.R. 17070, since the work stoppage made it clear that the nation could not tolerate a widespread breakdown in postal service. House Report [on H.R. 17070] at 3, [1970] U.S.Code Cong. & Admin.News at 3651.

16. However, there was no such exception in the case of preference-eligible employees, such as veterans. H.R. 4, 91st Cong., 2d Sess., § 801(c) at 140 (1970).

17. House Comm. on Post Office and Civil Service, 91st Cong., 2d Sess., Recommendations of the President of the United States on H.R. 17070, at XI (Comm. Print 1970).

"by the parties of grievances and adverse actions arising under the agreement" (section 227(b)), with arbitration as the final step. H.R. 17070 also included a "fair hearing requirement," guaranteeing employees "an opportunity for a fair hearing on adverse actions, with representatives of their own choosing."[18]

■ The personnel and employee relations sections of H.R. 17070 emerged essentially intact from the House Committee on Post Office and Civil Service. The House Report summarizes the "fair hearing requirement" in words similar to those contained in section 801(a) of the revised H.R. 4:

[T]he Postal Service is required to establish procedures to assure its employees . . . of [an] opportunity to be heard before adverse action is taken against them.

House Report at 9–10, [1970] U.S.Code Cong. & Admin.News at 3658. We have found no suggestion in the legislative history, and appellants have shown us none, that the above-quoted portion of section 201(a) of H.R. 17070 was intended to expand postal employees' rights beyond those provided in section 801(a) of the revised H.R. 4; or that the "fair hearing requirement" was meant to provide an alternative, for appeal of adverse actions, to that of a collective bargaining agreement. Moreover, the House Report makes clear that H.R. 17070 would limit grievance procedures for non-preference eligibles[19] to those negotiated in a collective bargaining agreement.[20] It states that section 201(a)—

Provides that existing law on adverse actions shall continue to apply to employees of the Postal Service *except as modified by collective bargaining agreements* or except as new procedures are approved by the Civil Service Commission. [Emphasis added.]

*Id.* at 27, [1970] U.S.Code Cong. & Admin. News at 3676.

A review of the House debate on H.R. 17070 also demonstrates that the "fair hearing" was to be provided through a collective bargaining agreement. Congressman Udall, a member of the House Post Office and Civil Service Committee and a sponsor of H.R. 17070, explained the status of the "new postal worker after reform" and declared that he would "become a new kind of Federal civil servant" and that, because of collective bargaining, he would become "a viable force in creating real changes in his working conditions." 116 Cong.Rec. 20229 (1970). Mr. Udall added that—

every law, rule and regulation that covered the rights of the postal employee subject to collective bargaining would continue in force until they are changed through negotiations between the employees and management. Thus, this worker will continue to be guaranteed his job, his merit appointment and promotion procedures, his health benefits—everything like this—until such matters are changed through collective bargaining.

---

18. The phrase "with representatives of their own choosing" is taken directly from section 7 of the National Labor Relations Act, 29 U.S.C. § 157, and is a term of art meaning a union representative selected for the purpose of collective bargaining by the majority of the employees of a particular unit. *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 62, 95 S.Ct. 977, 984, 43 L.Ed.2d 12 (1975).

19. Section 201(c) of H.R. 17070 explicitly provided that provisions of law in favor of preference eligibles would apply to the Postal Service.

20. This conclusion is fortified by the supplemental views of Congressman Scott. One of his major objections to the bill was the effect of removing postal workers from the competitive civil service and leaving the determination of the terms and conditions of employment to collective bargaining. Of particular note are two letters he included with his views—one from the Assistant Comptroller General of the United States and the other from the Chairman of the CSC. House Report at 67–70, [1970] U.S.Code Cong. & Admin.News at 3708–11. The letters state that if the bill were enacted, all nonpreference-eligible employees would have all terms and conditions of their employment determined through collective bargaining and would no longer have any right to appeal an adverse action to the CSC.

*Id.*[21] Congressman Derwinski, another member of the committee, asserted a similar understanding:

All other terms and conditions of employment in effect when the Postal Service commences operations—including rates of pay, fringe benefits, seniority, rights on adverse actions, and so forth —will continue to apply unless changed by the Postal Service, and as far as employees who are represented by collective bargaining agents are concerned, any such change will be subject to collective bargaining as a matter of law.

. . . .

. . . [T]he statutory provisions relating to adverse actions in the competitive civil service will be applicable, except to the extent of any inconsistency with applicable collective bargaining agreements . . ., subject always to the provisions of the Veterans Preference Act.

*Id.* at 20231.

The legislative history of the Senate bill, S. 3842, *supra* note 11,[22] is also persuasive that grievance procedures must be handled solely in accordance with collective bargain-ing agreements. This bill would have required *both* preference and nonpreference eligibles to appeal adverse actions solely under the grievance procedures of a collective bargaining agreement. The report of the Senate Post Office and Civil Service Committee commented on this requirement as follows:

Employees who have competitive status under the Civil Service Act of 1883 shall automatically achieve career tenure under the postal career system, but thereafter the provisions of title 5, United States Code, relating to the competitive service shall not apply to officers and employees of the Postal Service. The Postal Service shall establish, pursuant to its collective bargaining agreements with postal labor unions and its programs developed for the offices [sic] and employees not subject to such agreements, a system which will assure career development and protection of employment rights. . . .

Veterans' preference shall apply to officers and employees in the Postal Service, but may in certain circumstances be subject to modification by labor-manage-

**21.** He also submitted a chart which compares the major personnel policies affecting the postal worker:

| Policy | Old Postal Worker | New Postal Worker |
|---|---|---|
| Hiring and Promotion | Set by Congress and Post Office Department | Will be identical to existing law until changed by collective bargaining |
| Health and Life | Set by Congress | Will be identical to existing law until changed by collective bargaining. |
| Retirement | Set by Congress | Set by Congress |
| Pay | Set by Congress | Will be identical to existing law until changed by collective bargaining |
| *Adverse Appeals, Disciplinary Action* | *Statute plus CSC, POD [Post Office Dep't] contracts with Union* | *Will be identical to existing law until changed by collective bargaining* |
| *Veterans Preference* | *Set by Congress* | *Set by Congress* |
| On-the-job injuries | Set by Congress | Set by Congress |
| Specific right of employee to petition Congress, individually or through Organization | In existing law | Continues as law |

*Id.* at 20230 (emphasis added).

**22.** The first bill providing for comprehensive postal reform was S. 3713, 91st Cong., 2d Sess. (1970), on which hearings were held. S. 3842, which embodied much of S. 3713, was subsequently reported out of committee.

ment agreements or programs developed for supervisory personnel. The committee recognizes the significant departure from the present status of preference eligibles which this provision makes, but we believe that if collective bargaining is to work, it must have the power to establish a seniority and retention system based primarily on postal career service.

S.Rep.No.91–912, 91st Cong., 2d Sess. 5–6 (1970). Although an amendment preserving existing veterans' preference rights for postal employees was subsequently adopted during debate on the floor (116 Cong.Rec. 22337 (1970)), there was no amendment with respect to the appeal rights of non-preference eligibles. Thus, it is clear that the Senate understood that appeal rights of nonpreference eligibles to adverse actions were to be solely determined by collective bargaining agreements.

*Congressional Intent*

Based on the theory that among the postal reform bills there were conflicting goals [23] (securing full Lloyd-LaFollette Act coverage for all postal employees versus subjecting all employment conditions to the collective bargaining process), appellants argue that two changes made by the Conference Committee to section 201(a) of the bill resulted in a substantial alteration of the meaning of what became section 1001(b) of PRA,[24] thus:

The final bill approved by the Conference Committee and passed ·by both Houses of Congress, then, represents an obvious comprise [sic], intended to satisfy both the need for greater administrative efficiency and the committment [sic] to retain the fundamental requisites of due

process for employees subjected to adverse actions. The cumbersome regulations requiring not one but two full evidentiary hearings on adverse actions were eliminated. Instead, the new Postal Service would be required only to provide one hearing, within the agency, without any right to appeal to the Civil Service Commission. Moreover, the Postal Service was left free to negotiate grievance procedures which could be chosen by an employee as an alternative to requesting the hearing made available pursuant to §1001(b). This compromise solution preserved the right of postal employees to at least one evidentiary hearing, while also providing flexibility and administrative efficiency for the new Postal Service.

However, we have several difficulties with this argument.

First, there is no indication in the Conference Report that either of the changes was substantive, and there is nothing to support appellants' contention that these changes were considered "crucial" and were the result of an "obvious compromise." [25] Second, as related earlier, by the time H.R. 17070 was reported out of committee there was no conflict over whether the terms and conditions of postal workers' employment would be determined solely by a collective bargaining agreement or whether full Lloyd-LaFollette Act protection would be granted. Finally, an analysis of the changes themselves reveals that they were "minor technical and clarifying changes," as described by the Conference Report. The need for the first change (putting the last sentence of section 201(a), which dealt with the applicability of chapter 75 of title 5, into section

---

**23.** Appellants contend that this conflict is evident from the different language in the original H.R. 4 and the subsequent bills, H.R. 11750, revised H.R. 4, and H.R. 17070.

**24.** These changes were: (1) the final sentence of section 201(a) (providing that chapter 75 of title 5 would continue to apply to nonpreference eligibles until modified by a collective bargaining agreement and, for nonunion employees, until USPS issued regulations) became section 1005(a)(1); and (2) the phrase of section 201(a), "subject to subchapter II of this title,"

was replaced in section 1001(b) of PRA by "in accordance with this title."

**25.** The report stated that the "differences between the House bill and the substitute agreed to in conference [PRA] are noted below except for minor technical and clarifying changes made necessary by reason of the conference agreement." Conference Report at 79, [1970] U.S.Code Cong. & Admin.News at 3712. The two changes referred to by appellants are not mentioned.

1005(a)(1) of PRA) is obvious from the heading of section 1005, "Applicability of laws relating to Federal employees." The second change (substituting "in accordance with this title" for "subject to subchapter II of this title") did not alter the meaning of the affected sentence and was necessitated by the first change. The language of section 1001(b) of PRA was required to subject the "fair hearing requirement" to all collective bargaining provisions of PRA. Section 201(a) of H.R. 17070 had done this by reference to subchapter II; however, because of the first change, the "fair hearing requirement" would not have been subjected to section 1005(a)(1). Therefore, the Conference Committee substituted the broader language "in accordance with this title."

We conclude that there is no basis for appellants' contention that these changes effected a substantive change, much less reflected an intent that adverse action procedures for nonpreference-eligible postal employees not be solely a matter left to collective bargaining. We note that this conclusion is consistent with what would be expected to follow from PRA's stated purpose, namely: that the labor-management provisions "would bring postal labor relations within the same structure that exists for nationwide enterprises in the private sector." House Report at 13, [1970] U.S. Code Cong. & Admin.News at 3662.

Appellants further argue that, to make the "fair hearing requirement" of section 1001(b) of PRA subject to section 1206(b) (which makes grievance procedures a subject of collective bargaining), would ignore the cardinal rule of statutory construction that specific terms prevail over general ones. However, this ignores that the section creating the "fair hearing requirement" specifically requires that it be "in accordance with this title." Throughout the legislative history of both the House and Senate bills, the "fair hearing require-

ment" was similarly limited.[26] Moreover, the "fair hearing requirement" was, since its first appearance, qualified by the phrase "with representatives of their [postal employees] own choosing." As discussed *infra*, it is through their union representatives that postal workers receive the "fair hearing" which satisfies the due process clause of the Fifth Amendment. Since there has been no argument to the contrary by appellants, grievance procedures which satisfy the due process clause may be presumed to pass the "fair hearing requirement" of 39 U.S.C. § 1001(b).

Accordingly, we hold that the grievance procedures adopted for nonpreference-eligible postal employees by USPS and the Union do not violate the Postal Reorganization Act.

## II. *The Constitutional Issues*

Appellants' argument that the grievance procedures of the National Agreement violate their rights to due process raises two issues:

(1) Did appellants have a property interest in continued employment with USPS; and, if so,

(2) Did the grievance procedures of the National Agreement satisfy the constitutional requirements of due process for protection of that property interest?

Fundamental to the due process issue is the fact that appellants are employees in a national collective bargaining unit subject, under 39 U.S.C. § 1209(a), to the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* Through PRA, Congress brought USPS employees into the labor relations mode of the private sector. Thus, postal employees are represented by a union, which negotiates as the *exclusive* representative for all of the employees in the collective bargaining unit.[27] 39 U.S.C. § 1203(a).

---

**26.** For example, H.R. 17070, the first House bill to include the "fair hearing requirement," made that requirement "subject to subchapter II of this title"; subchapter II contained § 227(b), which became § 1206(b) of PRA. Similarly, S. 3842 made the requirement "subject to section

1104 and chapter 13 of this title"; § 1306(b), within chapter 13, also corresponds to § 1206(b) of PRA.

**27.** The provisions of PRA providing for exclusive representation by the collective bargaining

*Cf. Vaca v. Sipes*, 386 U.S. 171, 194–95, 87 S.Ct. 903, 918–919, 17 L.Ed.2d 842 (1967). The rationale for such action has been explained in Cox, *Rights Under a Labor Agreement*, 69 Harv.L.Rev. 601 (1956).[28] Professor Cox's views were succinctly set out in *Ostrofsky v. United Steelworkers of America*, 171 F.Supp. 782, 790–91 (D.Md. 1959), *aff'd*, 273 F.2d 614 (4th Cir.), *cert. denied*, 363 U.S. 849, 80 S.Ct. 1628, 4 L.Ed.2d 1732 (1960), thus:

> A prime function of a grievance procedure is to secure uniformity in interpreting the agreement and building up a "law of the plant" with respect to matters not spelled out in the agreement. In grievances arising out of problems not foreseen at the time of contract negotiations, although the issue is nominally framed by the past, the important question is often what rule shall govern the parties' conduct in the future. The group may be affected by future implications of the ruling to an extent that far outweighs the individual's claim for damages. Vesting the Union with control of all grievances increases the likelihood of uniformity and reduces "a potential source of competitions and discriminations that could be destructive of the entire structure of labor relations in the plant". It prevents dissident minorities from pressing real or imagined grievances in an effort to squeeze the last drop of competitive advantage out of each grievance. Allowing an individual to compel arbitration whenever he is dissatisfied with the company-union adjustment would discourage day-to-day cooperation between union and company in which grievances are treated as problems to be solved. Public officials and arbitrators, as well as employers, constantly remind union officials that they have a duty to discountenance disruptive and frivolous claims. If they are to accept this responsibility, union officials should be given the power to make their decisions effective. [Footnote omitted.]

The exclusive representative must, of course, represent all employees fairly and in good faith. *Vaca v. Sipes, supra*; *Emporium Capwell Co. v. Western Addition Community Organization, supra.*

*Property Interest*

■ Property interests are not created by the Constitution, but rather "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In the instant case, appellants' interest in continued employment did not flow from the statute, but from the terms and conditions of employment negotiated in their behalf by their exclusive representative (39 U.S.C. § 1206(b)) and set forth in article XVI of the National Agreement, which provides that no employee shall be disciplined or discharged "except for just cause," and in article XV, which contains procedures for securing that protection. Thus, appellants had an expectancy, derived from "rules or understandings that secure certain benefits," to remain in their jobs unless just cause for removal could be shown. *Arnett v. Kennedy, supra*;[29] *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ Accordingly, we hold that appellants had a property interest in continued em-

---

28. The Supreme Court has also cited the Cox article with approval. *See Vaca v. Sipes, supra* at 191, 87 S.Ct. at 917; *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965).

29. Although differing on the point of due process, both the plurality and concurring opinions in *Arnett v. Kennedy* recognized the existence of a property interest.

representative have been held constitutional. *National Postal Union v. Blount*, 341 F.Supp. 370 (D.D.C.), *aff'd mem. sub nom., National A. Letter Carriers v. National Alliance Postal & Fed. Employees*, 409 U.S. 808, 93 S.Ct. 67, 34 L.Ed.2d 69 (1972); *National Alliance Postal & Fed. Employees v. Klassen*, 514 F.2d 189 (D.C. Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975).

ployment with USPS that was entitled to due process protection.

## Due Process Protection [30]

■ .As observed by the Supreme Court, "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); *accord, Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). To determine whether the PRA's procedures governing nonpreference eligibles are constitutionally sufficient requires consideration of the governmental and private interests affected. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488, 494–95 (7th Cir. 1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973). These are:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of

such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *accord, Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The procedures actually afforded appellants must also be examined.[31]

Appellants were each given a thirty-day notice of discharge (with pay), which included the reason for the discharge. National Agreement, art. XVI, § 3. They were given the right to file grievances, and they personally discussed their cases with their immediate supervisors, accompanied by their Union representative.[32] *Id.* art. XV, § 2, step 1. They exercised their right, through their exclusive representative, to two additional appeals to successively higher levels of management, at which the reasons for

---

**30.** The district court, citing the plurality opinion of Mr. Justice Rehnquist in *Arnett v. Kennedy, supra,* said that since the statute sets forth the procedure for the protection of the property interest, the postal employees are entitled to *no more* due process than that afforded by the National Agreement. However, this court, in *Muscare v. Quinn,* 520 F.2d 1212, 1216 n. 4 (7th Cir. 1975), *cert. dismissed as improvidently granted,* 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976), adopted the analysis of the concurring and dissenting opinions—that the protected property interest must be subjected to *constitutional* scrutiny, stating: "It can hardly be said, therefore, that *Arnett* stands for the proposition that, by accepting governmental employment, a civil servant is entitled only to such procedures as are provided by statute." *Accord, Olshock v. Village of Skokie,* 541 F.2d 1254 (7th Cir. 1976); *Jacobs v. Kunes,* 541 F.2d 222 (9th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977); *see Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Staton v. Mayes,* 552 F.2d 908 (10th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977); *Stapp v. Avoyelles Parish School Board,* 545 F.2d 527 (5th Cir. 1977); *Kennedy v. Robb,* 547 F.2d 408 (8th Cir. 1976), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).

**31.** They should be viewed in light of the Congressional intent to provide, for the first time, for full collective bargaining for public employees in order to relieve a turbulent condition in the USPS, which is so vital to the national economy. As noted previously, a crisis in postal labor relations, culminating in the strike of 1970, occurred during consideration of postal reform by the Congress and clearly influenced the approach adopted by the PRA, thus:

Events of last March [the strike], however deplorable they may be, have finally established that a basic change in postal labor relations is overdue. Although contemporary labor relations in the private sector of the national economy have not been free of problems, they add up to a triumphant success as compared with those in the Postal Service.

House Report at 13, [1970] U.S.Code Cong. & Admin.News at 3662.

**32.** Under section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), an employee who wishes to pursue his or her own grievance alone without the intervention of the union representative may do so, as long as his actions are "not inconsistent with the terms of a collective-bargaining contract or agreement then in effect."

denying the grievances were discussed. *Id.* steps 2A and 2B. Their exclusive representative had the legal right to fully investigate the grievances and to obtain from USPS any information or documentation reasonably necessary to process the grievances. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *P. R. Mallory & Co. v. NLRB,* 171 N.L.R.B. 68, *enforced,* 411 F.2d 948 (7th Cir. 1969).

Finally, appellants through their exclusive representative, had an opportunity to request arbitration of their grievances.[33] National Agreement, art. XV, §§ 2 and 3. Although their representative declined their requests to demand arbitration, appellants could have sued the Union for breach of its duty to fairly represent them if the refusal to demand arbitration was not in good faith. 39 U.S.C. § 1208(c); *Vaca v. Sipes, supra* at 194–95, 87 S.Ct. at 918–919.[34]

Considering the governmental and private interest factors set forth in *Mathews v. Eldridge, supra,* it is, first of all, true that the private interest of appellants is substantial. However, "the risk of an erroneous deprivation of such interest through the procedures used" under the National Agreement appears minimal, as does any "probable value . . . of additional or substitute procedural safeguards."[35] The exclusive representation of nonpreference-eligible postal employees in labor-management relations under the PRA is no different from that of private sector employees under the National Labor Relations Act. Just as in the private sector, the Government has a vital interest in seeing to it that a union representing government employees has authority to meet its "duty to dis-

countenance disruptive and frivolous claims" in order to avoid conditions of disorder and instability which could be disastrous to the economy. *Ostrofsky v. United Steelworkers of America, supra* at 791.

In view of the foregoing, we hold that the grievance procedures adopted for non-preference-eligible postal employees by USPS and the Union do not violate the due process clause of the Fifth Amendment.[36]

The judgment of the district court is affirmed.

---

**33.** Appellants have not argued that the arbitration hearing would have failed to meet the most stringent due process procedural requirements.

**34.** However, appellants have not contended here that the Union violated its duty of fair representation. Appellant Winston filed with the NLRB, 13–CB–5372(P), an unfair labor practice charge against the Union, alleging that the Union had processed his discharge grievance in an arbitrary and capricious manner. This charge was dismissed by the NLRB's Regional Director on June 7, 1974, and the

NLRB's General Counsel denied Winston's appeal on June 24, 1974.

**35.** Quite simply, appellants were unable to convince their Union representative of the merits of taking their case to an impartial arbitrator.

**36.** It is unnecessary to decide whether appellants' use of the grievance procedures of the National Agreement constituted a waiver of their due process argument, as contended by the Union.