Doris HOLBROOK, Plaintiff-Appellant,

v.

Henry C. PITT, Defendant and Third-Party Plaintiff,

v.

SECRETARY, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Third-Party Defendant-Appellee.

No. 80–1006.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1980.

Decided March 2, 1981.

Rehearing Denied July 2, 1981.

---

Lawrence G. Albrecht, James A. Grambling, Jr., Legal Action of Wisconsin Inc., Milwaukee, Wis., for plaintiff-appellant.

William C. Calahan, Jr., Asst. U. S. Atty., Milwaukee, Wis., for third-party defendant-appellee.

Before BAUER, Circuit Judge, KILKENNY, Senior Circuit Judge,* and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

This is an appeal by tenants of certain housing projects in Wisconsin who are beneficiaries of housing assistance payments made by the United States Department of Housing and Urban Development ("HUD") under its housing assistance program for existing multifamily projects benefiting from HUD-insured or HUD-held mortgages. This program was established pursuant

---

* The Honorable John F. Kilkenny, Senior Circuit Judge of the Ninth Circuit Court of Appeals, is sitting by designation.

to Section 8 of the United States Housing Act of 1937 (as amended by § 201(a) of the Housing and Community Development Act of 1974), 42 U.S.C. § 1437f (1976) ("Section 8"). Under this program, HUD executes contracts with project owners to make rental payments on behalf of eligible low-income tenants (the "Contracts"). Appellants contend they are entitled to these rent subsidies within a reasonable time after the effective date of the Contracts between HUD and the various project owners. The tenants also argue that the rent subsidies should be made retroactive to the effective dates of the respective Contracts. Appellants further claim that HUD's procedures for making rental assistance payments violate the Due Process clause of the Fifth Amendment to the United States Constitution.

The district court granted summary judgment in favor of the Secretary of HUD (the "Secretary"), who was the third-party defendant, finding that the tenants had no claim under the Contracts since no provisions of the Contracts were breached. The district court also found that the tenants' interest in receiving housing assistance payments was only a "subjective expectancy" which was not entitled to due process protection. We hold that the Contracts were breached and that the tenants can recover retroactive benefits as third-party beneficiaries; we also find that tenants in existing HUD-insured projects assisted under Section 8 are generally entitled to housing assistance benefits within a reasonable time after the effective date of the applicable Section 8 Contract. We further determine that appellants have a legitimate claim of entitlement to housing assistance payments as of the effective dates of the Contracts. We therefore reverse and remand.

*The Case*

This litigation began as a small claims action in Milwaukee County Court in July 1977, to recover housing assistance payments allegedly due to plaintiff Doris Holbrook from defendant Henry Pitt, the owner of Main Street Gardens, the housing project in which Holbrook lived. Pitt subsequently filed a third-party complaint against the Secretary, alleging a breach of duty to inform Pitt of his Section 8 Contract obligations. HUD removed the action to the United States District Court for the Eastern District of Wisconsin.

After the district court granted Holbrook's motion to amend her complaint, the original complaint was redesignated as Count I. In Count II, Holbrook then asserted a class claim for declaratory judgment and damages on behalf of the class of tenants in multifamily projects in Wisconsin who had been certified for Section 8 assistance payments by the owners of their dwelling units.[1] Count II was based on the theory that the members of the tenant class were third-party beneficiaries of the Contracts executed between HUD and the owners of the projects in question, and that the class was thereby entitled to Section 8 benefits retroactive to the effective dates of the Contracts, payable within a reasonable time after the dates of execution.

In Count III, the plaintiff class alleged that they were denied retroactive assistance payments in violation of the Due Process clause of the Fifth Amendment to the United States Constitution.[2] The tenants argued that they had a legitimate claim of entitlement to the receipt of Section 8 benefits as of the date of Contract execution and that the provision of such benefits must commence not later than thirty days after

---

1. The class certified in Count II includes all families in Wisconsin who resided in certain dwelling units when Section 8 Contracts were executed between HUD and the owners of these dwelling units and who were certified for housing assistance payments pursuant to these Contracts, but who did not receive the benefit of payments as of the effective dates of the Contracts.

2. The class certified in Count III includes all families in Wisconsin who resided or will reside in dwelling units when Section 8 Contracts were executed or will be executed between HUD and the owner of these dwelling units and who were certified or will be certified pursuant to these Contracts for housing assistance payments, but who did not or will not receive the benefit of such payments as of the effective dates of the Contracts.

the execution date. To enforce these rights, plaintiffs requested, *inter alia*, that HUD be ordered to provide a meaningful opportunity for all class members to challenge HUD's procedures regarding administration of the Contracts.

After extensive discovery, the parties, on a joint statement of uncontested facts, filed cross motions for summary judgment. While these motions were pending, Pitt certified Holbrook for the claimed retroactive housing assistance payments. HUD then tendered full payment to Holbrook.

The district court found that, because of the payment to Holbrook, Count I had become moot. As to Count II, the district court held that, even assuming that plaintiffs were third-party beneficiaries, they were bound by the terms of the Section 8 Contracts, which HUD had not breached. With respect to Count III, the court found that plaintiffs possessed only an "inchoate property interest" in the receipt of housing assistance payments, which was merely a "subjective expectancy" not entitled to due process protection. HUD's motion for summary judgment was therefore granted.[3]

Plaintiff Holbrook lived with her four minor children in Milwaukee, Wisconsin in

Main Street Gardens, a housing development owned by Henry Pitt. On June 10, 1976, HUD and Pitt executed a Section 8 Contract under which housing assistance payments were to be paid to Pitt's eligible tenants, including Holbrook. Under the Contract, HUD committed funds to make housing assistance payments on behalf of eligible tenants as of June 1976. Funds were not disbursed under the Contract, however, until Pitt certified to HUD the names of the eligible tenants and the amount of subsidy to which each was entitled.[4]

Despite prodding by Holbrook and HUD, a Section 8 application, and eligibility and certification forms were not mailed by Pitt to residents of Main Street Gardens until November 16, 1976. Holbrook and other eligible families at Main Street Gardens were then certified and received Section 8 payments beginning December 1976. But, at the time of certification, no retroactive payments were made, as were authorized and for which funds had been set aside.[5]

### The Section 8 Program

The federal policy of providing decent, safe and sanitary housing for all families,

---

**3.** After the instant appeal was filed, plaintiffs orally moved (on the basis of Pitt's certification of Holbrook and tender of full payment of claimed retroactive payments) to dismiss defendant Pitt from the appeal, and this motion was granted.

**4.** At the time the Contract between HUD and Pitt was executed, Holbrook paid $182.03 per month in rent; she also paid for electric service. Her total housing costs allegedly consumed nearly 50 percent of her monthly income. Under the Section 8 program she was entitled to subsidies from HUD that would limit her housing costs to 25 percent of her monthly income.

**5.** With respect to the Contracts executed between 1976 and 1979 between HUD and the forty-nine multifamily project owners in Wisconsin, HUD made housing assistance payments on behalf of 1,736 certified families, who are members of the class certified in Count II. Of these, 336 families (19.3 percent) waited longer than ninety days after the effective dates of their respective Contracts to be certified and to receive initial housing assistance payments,

including Holbrook and twelve other families at Main Street Gardens. An additional 188 families (10.8 percent) waited sixty days to receive payments and 772 families (44.5 percent) waited less than thirty days. The record is unclear concerning the delay in initial payments for the remaining 440 certified families (25.4 percent).

Implementation of Contracts at the following projects illustrates the inconsistent manner in which HUD initiated housing assistance payments on behalf of certified families:

(a) At West View Apartments:

i. the effective date of the Contract was December 1, 1976;

ii. the initial claim for housing assistance payments was submitted by the owner to HUD on November 23, 1976;

iii. HUD made housing assistance payments effective December 1976.

(b) At Watertown East I:

i. the effective date of the Contract was December 13, 1977;

ii. the initial claim for housing assistance payments was submitted by the owners on June 9, 1978;

iii. HUD made housing assistance payments effective June 1978; no retroactive payments

first articulated in the United States Housing Act of 1937, ch. 896, 50 Stat. 888 (codified in scattered sections of 42 U.S.C.), has inspired numerous programs designed to increase the availability of housing for lower income families.[6] The Section 8 lower income housing assistance program, which was enacted as part of the Housing and Community Development Act of 1974, Pub.L. 93–383, 88 Stat. 633 (codified in scattered sections of 5, 12, 20, 31, 42, 49 U.S.C.), is one of the most ambitious of these efforts.[7] This program was enacted for the dual purposes "of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (1976). Section 8 was designed to achieve these goals by providing rent subsidies to lower income families living in housing owned primarily by private developers. All tenants whose incomes do not exceed 80 percent of the median income for their area are eligible for Section 8 assistance.[8]

In implementing Section 8, HUD has created several distinct subprograms, which are set forth in the regulations found at 24 C.F.R. § 880 *et seq.* (1980). Defined according to the characteristics of the housing to be subsidized, there are separate subprograms governing Section 8 assistance payments for, *inter alia,* newly constructed housing, 24 C.F.R. § 880 (1980), substantially rehabilitated housing, 24 C.F.R. § 881 (1980), existing housing, 24 C.F.R. § 882 (1980), and housing developed under public housing agency programs, 24 C.F.R. § 883 (1980).

Appellants reside in projects with HUD-insured or HUD-held mortgages. Main

---

to cover the period from December to June were made since none were requested by the project owner.

(c) At Meadow Village:

i. the effective date of the Contract was October 21, 1977;

ii. the initial claim for housing assistance payments was submitted by the owner on June 20, 1978;

iii. HUD made retroactive housing assistance payments to cover the period from October to June since the tenants here were certified for retroactive benefits by the project owner.

6. *These programs include, inter alia, the Housing Act of 1949, ch. 338, 63 Stat. 413 (codified in scattered sections of 12, 42 U.S.C.), the Housing Act of 1961, Pub.L. 87–70, 75 Stat. 149 (codified in scattered sections of 12, 42 U.S.C.), the Housing and Urban Development Act of 1965, Pub.L. 89–117, 79 Stat. 451 (codified in scattered sections of 12, 15, 20, 38, 40, 42, 49 U.S.C.), the Housing and Urban Development Act of 1968, Pub.L. 90–448, 82 Stat. 476, (codified in scattered sections of 42 U.S.C.), and the Housing and Community Development Act of 1974, Pub.L. 93–383, 88 Stat. 633 (codified in scattered sections of 5, 12, 20, 31, 40, 42, 49 U.S.C.).*

*Many of these programs were enacted because of the perceived failure of existing legislation to provide decent housing for lower income families. The Housing and Urban Development Act of 1968, for example, which set ambitious goals for the preservation of existing housing as well as the creation of additional housing through construction and rehabilitation, included the congressional finding that the* supply of housing was not increasing rapidly enough to realize "the goal of a decent home and suitable living environment for every American family." 42 U.S.C. § 1441a (1976).

7. Congress has described the Section 8 program as "the Nation's major tool for assisting the construction of lower income housing." S.Rep. No. 94–749, 94th Cong., 2nd Sess. 3, *reprinted in* [1976] U.S.Code Cong. & Ad.News 1885, 1887. *See also* S.Rep.No. 93–693, 93rd Cong., 2nd Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 4273 *et seq.*

8. Under the Section 8 program, the monthly rent an owner may charge is generally limited to 110 percent of the fair market rental of the units. 42 U.S.C. § 1437f(c)(1) (Supp. III 1979). Eligible families are required to pay not more than 25 percent of their income for rent (or 15 percent in the case of certain tenants). 42 U.S.C. § 1437f(c)(3) (1976). The difference between the amount payable by eligible families and the total rental amount due to the owner is the amount subsidized by HUD in the form of housing assistance payments. Owners do not receive an increase in rental income as the result of Section 8 Contracts. Rather, the rent payable by each certified tenant is apportioned between the tenant and HUD based on both the tenant's income and family size.

Pursuant to § 202 of the Housing and Community Development Amendments of 1979, 42 U.S.C. § 1437f(c)(3) (Supp. III 1979) was amended to increase the tenant's share of the rent to a maximum of 30 percent of income. However, tenants currently in occupancy are exempt from this increase.

Street Gardens, for example, where Holbrook resides, received the benefit of mortgage interest payments under Section 236 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1715z–1 (1976).[9]

The regulations applicable to the making of housing assistance payments on behalf of tenants in projects subject to HUD-insured mortgages are found at 24 C.F.R. § 886 (1980). These regulations, together with HUD's program instruction handbook,[10] establish the policies and procedures pursuant to which HUD makes housing assistance payments for projects with HUD-insured mortgages. The heart of this Section 8 subprogram is the Contract between HUD and the owner, which governs the relationship between the contracting parties and defines the rights and duties of the owner with respect to the administration of the Section 8 subprogram.

Prior to execution of a Contract, the owner must submit information regarding the gross income, number of household members under age 18 and rent-to-income ratio for each resident household, present vacancies and any rental increases currently being processed by HUD. At the time a Contract is executed, HUD commits funds to that project. The dollar amount of HUD's maximum commitment of funds is set at 75 percent of the current HUD-approved rents for the units expected to receive Section 8 subsidies. These units include the units occupied by families whose gross incomes and rent payments would appear to make them eligible for Section 8 assistance as well as the units that were vacant when the owner applied for a Contract. This calculation of the maximum contract commitment can include a proposed rent increase if HUD anticipates its approval.

Pursuant to paragraph 1.9c of the model Contract,[11] the owner is responsible for determining and verifying the eligibility of families, processing necessary application and verification forms, selecting families who will receive Section 8 assistance,[12] and computing the amount of housing assistance payments to be made on their behalf, a process denominated as "certification."[13] Upon the completion of certification of eli-

9. 12 U.S.C. § 1715z–1(a) (1976) sets forth the purpose of the Section 236 program:

> For the purpose of reducing rentals for lower income families, the Secretary is authorized to make, and to contract to make, periodic interest reduction payments on behalf of the owner of a rental housing project designed for occupancy by lower income families, which shall be accomplished through payments to mortgagees holding mortgages meeting the special requirements specified in this section.

> Tenants residing in Section 236 developments are required to pay, as rent, the greater of either one-fourth of their monthly income, as defined, or a "basic rental charge determined on the basis of operating the project with [the Section 236 mortgage interest subsidies]." 12 U.S.C. § 1715z–1(f)(1) (1976).

> For 20 percent of the units in projects assisted by Section 236 after August 22, 1974, HUD is authorized to make "additional assistance payments to the project owner on behalf of tenants whose incomes are too low for them to afford the basic rentals . . . with 25 per centum of their income." 12 U.S.C. § 1715z–1(f)(2) (1976).

10. HUD, Section 8 Additional Assistance Program for Projects with HUD-Insured or HUD-Held Mortgages (1976) ("Handbook").

11. It appears that the model Contract, which is included in the Handbook as an appendix, was used as the actual Contract for every agreement, to which this case has application, between HUD and the owners under the Section 8 HUD-insured mortgage subprogram.

12. This responsibility would only arise if, at the time certification occurs, the number of units occupied by eligible tenants is greater than the number of units authorized to be assisted under the Contract.

13. Paragraph 1.9(c) of the Contract, which contains the basic provision pertaining to certification of eligible tenants, reads as follows:

> 1.9 *Leasing of Units*
>
> . . . .
>
> c. *Eligibility, Selection and Admission of Families.*
> (1) The Owner shall be responsible for determination of eligibility of applicants, selection of families from among those determined to be eligible, and computation of the amount of housing assistance payments on behalf of each selected Family in accordance with schedules and criteria established by the Government.

gible families by the owner, HUD makes housing assistance payments to owners on behalf of tenants in accordance with the provisions of the Contract.[14]

HUD also maintains a project account "to assure that housing assistance payments will be increased on a timely basis to cover [HUD-approved] increases in Contract rents or decreases in Family Incomes." 24 C.F.R. § 886.108(c) (1980). According to HUD's regulations, this project account is established and maintained "out of amounts by which the maximum annual Contract commitment per year exceeds amounts paid under the Contract for any year." 24 C.F.R. § 886.108(c)(1) (1980). It appears from the record, however, that HUD actually deposits the entire amount of the maximum contract commitment in a segregated account at the time the Contract is executed.

Although HUD imposes no duty on owners to submit certifications at any specified time,[15] HUD regulations allow housing assistance payments to be made as of the effective date of the Contract and funds are committed by HUD to provide for payments from that date. 24 C.F.R. § 886.108 (1980). HUD, however, has refused to make housing assistance payments on behalf of tenants for the period between the effective date of the Contract and the month in which tenants are certified by the project owner, unless the owner provides for proper certification (termed "retroactive certification") for the intervening months.

After the effective date of a Contract, but before the initiation of housing assistance payments, HUD provides no administrative process for determining a tenant's eligibility to receive housing assistance payments. Nor does an administrative procedure exist whereby an eligible (whether certified or uncertified) family may, in appropriate circumstances, challenge either a project owner's initial delay in certifying eligible tenants for payments or an owner's unwillingness or refusal to certify tenants for payments retroactive to the Contract date.

*Discussion*

1. *Tenants' Third-Party Beneficiary Claim*

In Count II, the tenant class asserted their rights as third-party beneficiaries of the Contracts executed between HUD and the owners. The tenants sought prompt implementation of the Contracts as well as the receipt of retroactive benefits. The district court declined to rule on the third-party beneficiary issue but found that, in any event, the Contracts had not been breached since HUD had no contractual duty to pay benefits from the effective dates of the Contracts. *Holbrook v. Pitt*, 479 F.Supp. 990, 994 (E.D.Wis.1979).

Plaintiffs' approach in this case seems to have made analysis of their claims for retroactive benefits unnecessarily difficult. They argue that HUD has improperly administered the Section 8 program by totally delegating certification responsibilities to

---

**14.** Contracts may be executed for an initial period of up to five years, renewable for successive five year terms by agreement between the owner and HUD. The total Contract term cannot exceed fifteen years. 24 C.F.R. § 886.-111 (1980).

**15.** Paragraph 1.11(a) of the Contract provides as follows:

> 1.11 *Reduction of Number of Contract Units for Failure to lease to Eligible Families*
> a. *After First Year of Contract.*
> If at any time, beginning six months after the effective date of this Contract, the Owner fails for a continuous period of six months to have at least 80 percent of the Contract Units

leased or available for leasing by Families, the Government may on 30 days notice reduce the number of Contract Units to not less than the number of units under lease or available for leasing by Families, plus 10 percent of such number if the number is 10 or more, rounded to the next higher number.

This provision is an incentive to project owners to lease Contract units to eligible lower income families. There is no other express requirement for owners, detailed in the Contract, concerning either certification of eligible families within any specific time period or retroactive certification to the Contract date.

the owners. While this argument may have merit in the context of a claim that HUD has failed to meet its Section 8 obligations, it is only obliquely related to plaintiffs' claim that HUD has breached the Contracts before us.

In her original action, Holbrook had named Pitt, the owner of her building, as defendant. Pitt was dismissed from this action when he certified Holbrook for retroactive benefits and those benefits were paid to Holbrook by HUD. The other Wisconsin project owners who had executed Contracts with HUD were not named as defendants, however, when plaintiff subsequently asserted her class claim. Yet, since the Contracts place the obligation to certify tenants on the owners, it is not HUD but the owners who have most clearly breached the duty to properly certify the tenants. Despite this discrepancy, however, we have concluded that tenants can recover retroactive benefits because HUD breached its obligation to properly administer the Contracts by accepting non-retroactive certifications from the owners.

Under settled principles of federal common law,[16] a third party may have enforceable rights under a contract if the contract was made for his direct benefit. *Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 428, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959); *Williams v. Fenix & Scisson, Inc.*, 608 F.2d 1205, 1208 (9th Cir. 1979); *Owens v. Haas*, 601 F.2d 1242, 1248–50 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 362 (5th Cir. 1977); *Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1339 (2d Cir. 1974); *Euresti v. Stenner*, 458 F.2d 1115, 1118–19 (10th Cir. 1972); *Inglewood v. Los Angeles*, 451 F.2d 948, 955–56 (9th Cir. 1971); *Bossier Parish School Board v. Lemon*, 370 F.2d 847 (5th Cir.), *cert. denied*, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967). If the agreement was not intended to benefit the third party, however, he is viewed as an "incidental" beneficiary, having no legally cognizable rights under the contract.[17] *German Alliance Insurance Co. v. Home Water Supply Co.*, 226 U.S. 220, 33

---

**16.** Federal common law applies to plaintiffs' third-party beneficiary claims since a federal agency is a party to the action and since the outcome of this case will directly affect substantial financial obligations of the United States. *See United States v. Standard Oil Co.*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). *Miree v. DeKalb County*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), does not suggest a contrary result. The Court in *Miree* held that state and not federal common law applied to third-party beneficiary claims arising out of a contract between the Federal Aviation Administration and DeKalb County. Central to the Court's holding, however, was the fact that the United States, although a party to the contract, was not named as a defendant in the breach of contract claim. Therefore, in sharp contrast with the case before us, only the rights of private litigants were at issue, and resolution of the dispute would have had "no direct effect upon the United States or its Treasury." *Id.* at 29, 97 S.Ct. at 2493.

We note, however, that our result as to the third-party beneficiary claim would be the same if analyzed under Wisconsin law. *See Mercado v. Mitchell*, 83 Wis.2d 17, 264 N.W.2d 532 (1978); *Schell v. Knickelbein*, 77 Wis.2d

344, 252 N.W.2d 921 (1977); *In re Bratt*, 257 Wis. 447, 43 N.W.2d 817 (1950).

**17.** Consistent with the scheme set forth in the Restatement of Contracts § 133 (1932), most court decisions have recognized three classes of third-party beneficiaries—donee, creditor and incidental—with different rules governing the rights of each class. It has been suggested, for example, that a contracting party's "intent to benefit" a third party is relevant if the third party is viewed as a donee beneficiary, but not if the third party is viewed as a creditor beneficiary. *Isbrandtsen Co. v. Local 1291, Int'l Longshoremen's Ass'n*, 204 F.2d 495, 497 n.11 (3d Cir. 1953).

We decline to follow this approach, since it fails to focus on the central interpretative question involved in third-party beneficiary problems: did the contracting parties intend that the third party benefit from the contract? We prefer the approach of the Restatement (Second) of Contracts § 133 (Tent. Draft No. 4, 1968), which divides beneficiaries into two classes—intended and incidental. Section 133 provides:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is

S.Ct. 32, 57 L.Ed. 195 (1912); *Williams v. Fenix & Scisson, Inc.*, 608 F.2d at 1208; 4 A. Corbin, *Corbin on Contracts*, § 776 at 18–19 (1951); *Restatement of Contracts*, § 133 at 151–52 (1932).

To determine whether plaintiffs have enforceable rights under the Contracts we must analyze the purposes underlying their formation. Plaintiffs maintain that HUD executed the Contracts in order to provide rental assistance to low income families. HUD, however, claims that plaintiffs are only incidental beneficiaries of the Contracts, since the primary purpose of the Section 8 program, and the Contracts entered into pursuant thereto, was to benefit financially troubled HUD-insured projects. We reject this argument, as it is contradicted by the language of Section 8, relevant legislative history, HUD's implementing regulations and interpretations and the terms of the Contracts.[18] HUD's position displays an astonishing lack of perspective about government social welfare programs. If the tenants are not the primary benefici-aries of a program designed to provide housing assistance payments to low income families, the legitimacy of the multi-billion dollar Section 8 program is placed in grave doubt.

Congress did not establish the Section 8 housing assistance program merely to limit claims on HUD's insurance fund that might be occasioned by assignments or foreclosures of HUD-insured mortgages. Congress authorized Section 8 payments "[f]or the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (1976).

Section 8 is designed to provide rent subsidies to needy families. If Congress had intended to design Section 8 primarily to assist financially troubled projects (rather than low-income families), it would have provided that Contracts would be awarded and funding structured in accordance with the financial condition of the housing projects.[19] Instead, it provided that Section 8 funds should be allocated according to the

---

appropriate to effectuate the intention of the parties and either

 (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

 (b) the promisee manifests an intention to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

We also decline to adopt the Restatement's position to the extent it may suggest that only the intentions of the "promisee" (the party through whom the beneficiary claims) and not the "promisor" (the party obligated to render performance that benefits the third party) are relevant to a determination of the third-party beneficiary's rights. Contracts are the product of shared intentions, and a promisor should be bound only by those objectively manifested intentions of the promisee to which the promisor has implicitly or explicitly assented. It is improper to neglect the reasonable expectations of the promisor, since the burden of the agreement to the promisor, and therefore the consideration he will require, may vary according to the number of parties who have enforceable rights under the contract. *See generally* Jones, *Legal Protection of Third Party Beneficiaries: On Opening Courthouse Doors*, 46 Cinn.L.Rev. 313 (1977).

18. We believe the legislative history and purpose of the Section 8 program may properly be used to interpret the parties' intentions. It is evident from the terms of the Contract that HUD, in executing the Contract, is acting to fulfill the objectives of the Section 8 program. The Contract itself is entitled "Section 8 Housing Assistance Payments Program" and Part I of the Contract expressly states that the "contract is entered into pursuant to the United States Housing Act of 1937." *Cf. Inglewood v. Los Angeles*, 451 F.2d 948, 955 (9th Cir. 1972); *Feir v. Carabetta Enterprises, Inc.*, 459 F.Supp. 841, 848 n.3 (D.Conn.1978).

19. It is instructive to compare Section 8 with Section 201 of the Housing and Community Development Amendments of 1978, 12 U.S.C. § 1715z–1a (Supp. III 1979), which *was* designed to assist financially troubled multifamily projects. Eligibility under Section 201 *does* turn on the likelihood that assistance will "restore or maintain the financial soundness of the project," 12 U.S.C. § 1715z–1a(d)(1) (Supp. I 1978), and the level of Section 201 assistance *is* based on the project's financial circumstances, not the tenants' incomes and rental assistance needs. 12 U.S.C. § 1715z–1(f) (Supp. III 1979).

financial needs of the tenants. The statute does not establish a preference for projects that may soon be in default on HUD-insured mortgages, but it does provide that 30 percent of the families assisted by Section 8 funds must be "very low-income families," 42 U.S.C. § 1437f(c)(7) (1976), which are defined as "those families whose incomes do not exceed 50 per centum of the median income for the area." 42 U.S.C. § 1437f(f)(2) (1976).[20]

HUD has also recognized that the function of the Section 8 subprogram we are considering is to assist low income families in securing decent, safe and sanitary housing. Thus, HUD's introduction to the regulations that established this subprogram provides:

> The purpose of this program is to assist families presently in occupancy in a HUD-insured or HUD-assisted project to more easily carry their rental burden.

42 Fed.Reg. 5602 (Jan. 28, 1977).

HUD's regulations further demonstrate that the Section 8 program is designed primarily to benefit low-income families. Under the regulations, a Contract may be executed only after a project owner establishes that a significant number of existing or potential tenants are "eligible for and in need of Section 8 assistance." 24 C.F.R. § 886.107(d) (1980). And, when a Contract is executed, HUD calculates and budgets funds not on the basis of the financial needs of the project's management but on the estimated rental assistance needs of eligible tenants.

The Contract terms also demonstrate that the tenants are intended beneficiaries of the Contracts. Paragraph 1.3(b)(1) provides, in part:

> The Government hereby agrees to make housing assistance payments on behalf of

Families for the Contract Units, to enable such Families to lease Decent, Safe, and Sanitary housing pursuant to Section 8 of the Act.

Numerous other Contract provisions make it clear that the Contracts were executed primarily for the tenants' benefit. Paragraph 1.7, for example, requires the owners to "maintain and operate the Contract unit and related facilities so as to provide Decent, Safe and Sanitary housing." *See also* paragraph 1.9(a) (requiring affirmative action in owner's marketing of units and selection of families); paragraph 1.9(b) (restricting owner's discretion regarding the collection and refunding of utility and security deposits); paragraph 1.10 (restricting owner's right to evict tenants).

HUD, of course, perceives that the Section 8 program also serves to minimize claims on its insurance fund. The creation of a separate Section 8 subprogram exclusively for projects with HUD-insured mortgages is compelling evidence of this perception. It is also apparent from the introduction to HUD's Handbook, which reads:

> The Section 8 set-aside program for existing multifamily projects benefiting from HUD-insured or HUD-held mortgages . . . is designed to accomplish two goals: (1) reduce the claims on HUD's insurance funds by stabilizing the finances of projects intended for low and moderate income residents by avoiding project mortgage assignments or, in projects with assigned mortgages, by preventing foreclosure and (2) assure the continued availability of units in these existing multifamily projects to the lower income families for whom they were intended by reducing to affordable levels the rent obligation of assisted families.[21]

■ We do not decide whether it is proper for HUD, in allocating Section 8 funds,

---

**20.** The only priority for acceptance of Contract applications set forth in the statute is geared toward realizing the Section 8 program's second express purpose of promoting economically integrated housing. Under 42 U.S.C. § 1437f(c)(5) (1976), the Secretary "may give preference to applications for assistance involving not more than 20 per centum of the dwelling units in a project."

**21.** Handbook, *supra* note 10 at 1. In similar fashion, a HUD-prepared model letter sent to owners of HUD-insured projects provides:

to give priority to projects with serious financial problems.[22] We believe, however, that this preference does not contradict the fact that the Contracts before us are intended primarily to benefit needy tenants. Plaintiffs have enforceable rights since the Contracts were intended to provide them with rental assistance. Subsidiary purposes, such as HUD's interest in minimizing claims on its insurance funds, do not defeat plaintiffs' status as protected beneficiaries. *See King v. National Industries, Inc.,* 512 F.2d 29, 32 (6th Cir. 1975); *Avco Delta Corp. v. United States,* 484 F.2d 692, 702 (7th Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *Beck v. Reynolds Metals Co.,* 163 F.2d 870, 871 (7th Cir. 1947).[23]

Having concluded that plaintiffs have enforceable rights under the Con-

tracts, we must determine whether the Contracts have been breached. The district court held that HUD did not violate any provision of the Contracts, since "it is the owner who is given the responsibility to effect certifications of eligibility, and there is no contract provision requiring HUD to make assistance payments until the necessary certifications [including retroactive certifications] are performed." *Holbrook v. Pitt,* 479 F.Supp. at 993.[24] Because they are somewhat distinct, we will consider first the question whether HUD breached the Contracts because the tenants were not promptly certified, and second, the question whether HUD breached the Contracts because the tenants were not retroactively certified.

The district court refused to imply a Contract term that would require the

This is to advise you that Section 8 project commitments are available for those projects with HUD-insured or HUD-held mortgages . . . which are likely to benefit most substantially from Section 8 assistance. Commitments will be made based upon HUD's approval of a project owner's request for participation in the program.

The Section 8 program is designed to assist lower-income residents by bringing their rents down to a level that they can afford, and to provide financial stability to housing projects which serve the needs of lower-income families by increasing the market for their units. Section 8 assistance can also help by assuring that needed rent increases can be implemented without forcing out those families needing such units. The Section 8 contract can cover up to 100 percent of the units and ties the subsidy to the project, not the individual residents. The eligible families and individuals in these projects will pay between 15 percent and 25 percent of income for rent. The difference between the tenant's share and the HUD-approved rent for the unit occupied will represent the amount of the assistance payment for that family or individual.

Handbook, *supra* note 10 at Appendix 3.

**22.** We note in this regard that the Senate Banking, Housing and Urban Affairs Committee's Report on the Housing Authorization Act of 1976 disapproved of HUD's efforts to direct Section 8 funds toward financially troubled FHA-insured projects:

The Committee recognized the merits of HUD's plan to help these projects, but disa-

greed with HUD's use of Section 8 funds for this purpose because it detracts from the *basic intent of Congress that such funds be used to provide additional housing units for low and moderate income families.*

S.Rep.No.94–749, 94th Cong., 2nd Sess. 12, *reprinted in* [1976] U.S.Code Cong. and Ad.News 1896 (emphasis supplied).

**23.** We believe that the status of appellants as third-party beneficiaries is not defeated by the fact that they are not specifically named in the Contracts, since they are identified at the time performance is due, *i. e.,* when certification occurs. *See Owens v. Haas,* 601 F.2d 1242, 1250 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Safer v. Perper,* 569 F.2d 87, 92 (D.C.Cir.1977); *Avco Delta Corp. v. United States,* 484 F.2d 692, 702 (7th Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *United States v. California State Automobile Ass'n,* 385 F.Supp. 669, 672 (E.D.Cal.1974), *aff'd,* 530 F.2d 850 (9th Cir. 1976); *Bethune v. United States Department of Housing and Urban Development,* 376 F.Supp. 1074 (W.D.Mo.1972); 4 A. Corbin, *supra,* § 781 at 70.

**24.** We agree with the district court that the tenants, as third-party beneficiaries, are bound by the terms and conditions of the Contracts. *See Holbrook v. Pitt,* 479 F.Supp. at 993. *See also Trans-Bay Engineers and Builders, Inc. v. Hills,* 551 F.2d 370, 378 (1976); *Rotermund v. United States Steel Corp.,* 474 F.2d 1139, 1142 (8th Cir. 1973).

owners to certify tenants within a reasonable time after execution of the Contract. We believe it is appropriate to imply such a term, since the purpose of the Contracts to provide housing assistance to lower income families would otherwise be frustrated. We agree with the district court, however, that *HUD* did not breach the Contracts with respect to the timing of certification.

The district court relied on paragraph 1.9(c) (Eligibility, Selection and Admission of Families), *supra* note 14, and on paragraph 1.11(a) (Reduction of Number of Contract Units for Failure to Lease to Eligible Families), *supra* note 16, of the Contracts in deciding that there was no contractual duty to certify tenants promptly. Paragraph 1.9(c), however, merely allocates the certification function to the owner. It does not address the form which certifications are to take, the date by which certifications are to be performed or the period of time certifications are intended to cover. Although paragraph 1.9(c) is silent on the question of time of performance, it is reasonably inferrable from the purpose of the Contract that the owner is obligated to perform his certification responsibilities within a reasonable time.[25]

We are similarly unpersuaded that paragraph 1.11(a) is intended to be the sole contract limitation on the timing of certification. Paragraph 1.11(a)'s penalty provision would not be triggered until one year after the effective date of the Contract. It is inconceivable, however, that the parties intended to allow a full year for implementation (while housing assistance payments built up in project accounts) of a shelter program designed to provide economic relief for poor tenants. Paragraph 1.11(a) merely establishes one remedy which HUD may resort to in the event that a project owner fails to keep Contract units leased or available for leasing by eligible families. It does not purport to govern the date by which owners must perform certification.

■ Since all the tenants in the class designated in Count II have been certified, it is not necessary to determine what would be a reasonable time to perform certification under the circumstances of this case. *Cf. A. M. R. Enterprises, Inc. v. United States Postal Savings Association*, 567 F.2d 1277, 1281 (5th Cir. 1978). In any event, although we have implied a Contract term requiring prompt certification, we believe that the owners, and not HUD, breached this implied term, since HUD had no mechanism (in the Contracts before us) to force the owners promptly to certify tenants.[26]

With respect to retroactive certification, the district court held that plaintiffs could not recover retroactive benefits because HUD was not *"required*, by the terms of the contract or otherwise, to pay retroactive benefits." *Holbrook v. Pitt*, 479 F.Supp. at 994. The court also refused to imply from the Contract that retroactive certification was required, finding again that paragraph 1.9(c) set "the terms and conditions of performance." *Id.* Yet we believe that paragraph 1.9(c) must be interpreted quite differently than the district court suggests. Paragraph 1.9(c) provides only that the owner is "responsible for . . . computation of the amount of housing assistance payments on behalf of each selected Family." It does not set forth the period for which housing assistance payments are to be re-

---

**25.** It is appropriate for courts to supply contract terms requiring performance within a reasonable time where such terms are necessary to fulfill the purposes of the contract. *See Trailmobile Co. v. Whirls*, 331 U.S. 40, 54–55, 67 S.Ct. 982, 989–990, 91 L.Ed. 1328 (1947); *Boyd Construction Co. v. T. L. James & Co.*, 477 F.2d 34, 35 (5th Cir. 1973); *Seaboard Coast Line Railroad Co. v. Long Island Rail Road Co.*, 447 F.Supp. 108, 114 (E.D.N.Y.), *aff'd*, 595 F.2d 96 (2d Cir. 1978).

**26.** Once owners did submit certifications, however, HUD was liable for the failure to provide retroactive benefits to tenants, since the owner should no longer have had any meaningful discretion with regard to the computation of the *amount* of the payments to be made on behalf of the tenants. As discussed below, we believe HUD improperly allowed owners to exclude retroactive benefits from their computations.

quested or paid. It certainly does not suggest that the obligation to compute housing assistance payments includes the right to arbitrarily deny to tenants benefits from the date of Contract execution. The very use of the word "computation" connotes the application of a formula to numbers, not the exercise of discretion—either arbitrary or informed.

We believe it is necessary to interpret the language of paragraph 1.9(c) to mean that retroactive certification is required. First, "computation" is a mathematical process presumably involving, *inter alia*, the multiplication of the amount of rental subsidy to which a particular tenant is entitled by the number of months the subsidy is due; the Contract language in no way suggests that the number of months is a matter of discretion. Rather, that number must be the number of months the tenant has lived in the project since the

Contract governing Section 8 payments was executed (and funds were set aside). Second, unless the language is construed to require retroactive payment, the primary purpose of the Contracts to provide housing assistance to low income families would be frustrated. HUD has not offered any justification for its policy of accepting certifications that do not provide for retroactive benefits covering all relevant months, and we can perceive no circumstances that would justify such a policy.[27]

HUD's calculation of the dollar amount of financial assistance it sets aside in a project account is based on the estimated monthly rental assistance needs of specific tenants beginning with the month in which the Contract is executed. HUD, therefore, has committed funds to pay housing assistance payments from the first day of the Contract period.[28]

Although the owners may exercise limited discretion with regard to the selec-

**27.** The district court apparently concluded that the tenants were bound by the failure of their project owners to submit retroactive certifications to HUD. But we think the binding effect of the owners' nonfeasance must be drastically tempered by the economic realities of the transactions. The owners have no economic stake in retroactive certification (except to the extent—which the record does not disclose—that accumulated financial burdens might force tenants sooner or later to default in rent payments). Indeed, the benefit of retroactive certification is almost entirely to the tenants. Thus, there is no direct financial incentive to owners to perform certifications in a way which will be advantageous to tenants. We think the purpose of the Contracts to assist tenants, who may be paying as much as 50 percent of their income for shelter expenses, ought not to be frustrated by the owners' failure to perform financially profitless acts. To accord weight, in this regard, to the owners' discretion is to convert the statutory scheme into a game of chance.

**28.** By segregating funds exclusively to pay rent subsidies on behalf of particular tenants, HUD has created an identifiable res to which the tenants have a claim in the nature of the equitable lien imposed in *Bennett Construction Co. v. Allen Gardens, Inc.*, 433 F.Supp. 825 (W.D. Mo.1977).

*Bennett Construction* involved the rights of a general contractor—a third-party beneficiary— to enforce the terms of a construction loan

agreement between HUD as assignee of a mortgage and a mortgagor project owner in default. The general contractor had completed construction and was owed certain undisbursed loan proceeds. *Bennett Construction* is like the instant case in that the mortgagor through whom the general contractor claimed was assertedly not entitled to performance in two respects: (1) it had not gone to final closing of the construction loan and (2) it was in default. These defects are analogous to the failure of the project owners in the instant case to certify tenants retroactively. *Bennett Construction* is, however, unlike the instant case in that the general contractor there was a *creditor* third-party beneficiary, and failure to impress the undisbursed loan proceeds with an equitable lien would have resulted in the unjust enrichment of HUD. "Unjust enrichment" is only at issue here to the extent that HUD might be said to be "enriched" by the opportunity to retain set-aside funds and to the extent that it is "unjust" to deny retroactive benefits to tenants who may have reasonably relied on receiving them.

In any case, *Bennett Construction* and the instant case are similar in that (1) there is an identifiable res (in *Bennett Construction* the undisbursed loan proceeds and here the set-aside funds) and (2) HUD in both cases is the "guiding spirit" and the dominant force. In *Bennett Construction*, the mortgagor owner was the "creature of HUD", 433 F.Supp. at 835. Here the project owners have (or should have) no meaningful discretion regarding the decision

tion of those families that are to receive benefits,[29] the owners' obligation to "compute" the amount of housing assistance payments is entirely ministerial. No reason has been suggested for allowing the owners to determine whether tenants will or will not receive retroactive benefits.[30] Therefore, by accepting deficient computations from the owners, we believe HUD breached its obligation to properly administer the Contracts, *see* 24 C.F.R. § 886.120(a) (1980), and its coordinate responsibility to third-party beneficiaries to fulfill the purposes of the Contracts, i. e., to provide full assistance benefits to certified families. Appellants can therefore recover retroactive benefits from HUD as third-party beneficiaries of the Contracts.

## 2. Tenants' Due Process Claim

 The class of tenants designated in Count III of the complaint includes only those tenants "who were certified or who will be certified pursuant to the contracts for housing assistance payments but who did not or will not receive the benefit of housing assistance payments as of the effective date of the contracts."[31] The narrow question before us, therefore, is whether the due process clause requires HUD to establish procedures to provide already certified tenants with notice and opportunity to be heard concerning the provision of retroactive benefits.[32]

The existence and scope of appellants' due process rights depend on the resolution of three issues. First, there must be gov-

---

to pay retroactive benefits. Based on these similarities we think there are persuasive reasons for regarding the funds set aside by HUD as impressed with a lien dictated by the policy of the Section 8 program in favor of the tenants from the execution dates of the Contracts. It is unjust to deny tenants the funds set aside specifically for their benefit solely because of the capricious decisions of their project owners not to make their certifications retroactive.

**29.** *See* note 12, *supra*.

**30.** Indeed, the question of retroactive certification often becomes important only if the owner breaches his obligation to promptly certify tenants. As the record in this case demonstrates, it is often possible for owners to certify tenants by the effective dates of their Contracts. *See* note 5, *supra*. In such cases, an owner would have the opportunity to choose whether tenants are to receive retroactive benefits only if he failed to promptly certify the tenants in the first instance. It is unreasonable to assume that the parties intended for the owner to have such a choice when the choice exists only because of the owner's initial breach of his contractual obligation of prompt certification.

**31.** The class designated in Count III would appear to include Wisconsin tenants who will be certified in the future under existing Contracts. In their brief on appeal, however, appellants assert that "all class members claiming entitlements to housing assistance payments as of the effective dates of the respective Section 8 Contracts *have already been certified and received benefits under the contracts.*" Appellant's brief at 30 (emphasis supplied).

On remand, the district court should determine whether due process protection should be extended to tenants certified in the future or whether appellants have waived such a claim.

**32.** In their amended complaint, appellants also requested declaratory and injunctive relief under the due process clause ordering the Secretary to amend the Contracts to require certification of tenants and initiation of benefits within thirty days. This relief was denied by the district court.

On appeal, appellants no longer seek this relief because of HUD's representation that it does not intend to execute any additional Contracts in Wisconsin. We therefore express no opinion on the merits of these claims.

We also note that our decision to provide appellants with due process protection regarding the decision to award retroactive benefits is largely superfluous, since we have decided that tenants have enforceable rights to retroactive benefits as beneficiaries under the Contracts. It would certainly be inappropriate for us to engage in unnecessary constitutional adjudication. *See Ruslan Shipping Corp. v. Coscol Petroleum Corp.*, 635 F.2d 648 at 650 (7th Cir. 1980).

We reach the due process claims, however, since appellants may want to invoke their due process rights if HUD does not promptly tender the full amount of retroactive benefits. Even if HUD does tender these benefits to existing tenants, tenants certified in the future under existing Contracts may be entitled to due process protection, since their rights as beneficiaries will not have been reduced to judgment at the time they are certified. *But see* note 31, *supra*.

ernmental action sufficient to invoke the guarantees of the fifth amendment. This requirement has clearly been met here. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Joy v. Daniels*, 479 F.2d 1236, 1238 (4th Cir. 1973). Second, the asserted interest must be shown to be a "liberty" or a "property" interest to which there is a claim of entitlement under the due process clause. *Morrissey v. Brewer*, 408 U.S. 471, 481–83, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484 (1972). Third, assuming an entitlement is established, what process is due? *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See generally Coppenbarger v. Federal Aviation Administration*, 558 F.2d 836, 839 (7th Cir. 1977).

In determining whether appellants have a constitutionally protected property interest, we are guided by the well-known discussion in *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of prop-

erty to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

 It is clear in the present case that appellants have established a legitimate claim of entitlement.[33] The tenants' interest in retroactive benefits rises above a subjective expectancy or a "unilateral expectation," *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, since, as concluded above, certified tenants have legally enforceable rights as beneficiaries under the Contracts to receive retroactive benefits.[34]

In similar circumstances, the United States Supreme Court held in *Perry v. Sindermann*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972), that a teacher at a state college would have a

---

**33.** In response to the need for insuring that government programs are not administered in an arbitrary or irrational fashion, courts have extended due process protections to a wide variety of governmentally conferred benefits. *See, e. g., Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (parole application); *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1967) (application for bar admission); *Wright v. Califano*, 587 F.2d 345, 354 (7th Cir. 1978) (social security benefits); *Freitag v. Carter*, 489 F.2d 1377 (7th Cir. 1973) (chauffeur's license application); *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir. 1968) (public housing application).

As court decisions have extended the notion of protected rights under the due process clause beyond traditional concepts of "liberty" and "property," however, it is often difficult to discern the boundaries of due process protection. *Compare Geneva Towers Tenants Organ-*

*ization v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974), *with Geneva Towers*, 504 F.2d at 494 (Hufstedler, J., dissenting) and *Harlib v. Lynn*, 511 F.2d 51 (7th Cir. 1975).

**34.** Indeed, HUD does not dispute that certified tenants have a legitimate claim of entitlement. Its brief on appeal states:

> In this case, a property interest did not arise until the owners certified plaintiffs as being eligible to participate in the Section 8 program. Prior to certification plaintiffs had merely an inchoate property interest. Only after certification by the owner did a property interest become choate. Therefore, plaintiffs' subjective expectancy is not constitutionally protected by the due process clause.

Thus, at most HUD challenges only the scope or magnitude of entitlement of certified tenants (i. e., whether the entitlement extends to retroactive benefits).

protectable interest in continued employment if he could demonstrate that his tenure claim was based upon an implied term in his employment contract. Here we have, in effect, implied a Contract term requiring retroactive certification. Tenants therefore have a legitimate claim of entitlement to such benefits.[35]

Courts have held in a variety of circumstances that certified tenants in Section 8 programs have protectable property interests under the due process clause. For example, *Ferguson v. Metropolitan Development & Housing Agency*, 485 F.Supp. 517 (M.D.Tenn.1980) and *Watkins v. Mobile Housing Board*, No. 79–0067–P (S.D.Ala. May 14, 1979) (order on plaintiff's motion for preliminary injunctive relief), both held that tenants have due process rights in connection with the termination of their certificates of family participation in the Section 8 subprogram for existing housing.[36] *See also Brezina v. Dowdall*, 472 F.Supp. 82

(N.D.Ill.1979). And, in *Ressler v. Landrieu*, No. A77–228C (D.Alas. March 6, 1980), the court extended due process protection to prospective applicants for Section 8 payments who were not yet certified, but who met the Section 8 eligibility criteria, despite the fact that project owners exercise limited discretion with respect to the selection of tenants to be certified. *See* note 12, *supra*.

The district court's analysis in the present case is inapposite because it is based on the assumption that appellants were claiming due process protection for tenants who had not yet been certified.[37] The class designated in Count III, however, is limited to those tenants who have already been certified and, probably in addition, those who will be certified in the future under existing Contracts.[38] *But see* note 31, *supra*. Thus, tenants are included in the class denominated in Count III only after they have been certified. We therefore do not express any opinion on the district court's holding that

**35.** At a minimum, the nature of the appellants' entitlement claim must be deemed to be that of *applicants* for retroactive benefits. Applicants who have met the objective eligibility criteria of a wide variety of governmental programs have been held to be entitled to protection under the due process clause. *See, e. g., Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (parole applicant); *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1967) (bar applicant); *Griffeth v. Detrich*, 603 F.2d 118 (9th Cir. 1979), *cert. denied*, 445 U.S. 970, 100 S.Ct. 1348, 64 L.Ed.2d 247 (1980) (general assistance applicants); *Larry v. Lawler*, 605 F.2d 954 (7th Cir. 1978) (federal employment applicant); *Carey v. Quern*, 588 F.2d 230 (7th Cir. 1978) (general assistance applicants); *Wright v. Califano*, 587 F.2d 345, 354 (7th Cir. 1978) (social security applicants); *White v. Roughton*, 530 F.2d 750 (7th Cir. 1976) (general assistance applicants); *Freitag v. Carter*, 489 F.2d 1377 (7th Cir. 1973) (chauffeur's license applicants); *Like v. Carter*, 448 F.2d 798 (8th Cir. 1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972) (AFDC applicants); *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir. 1968) (public housing applicants); *Meyer v. Niles Township*, 477 F.Supp. 357, 361–62 (N.D.Ill.1979) (general assistance applicants); *Davis v. United States*, 415 F.Supp. 1086 (D.Kan.1976) (worker's compensation applicant); *Alexander v. Silverman*,

356 F.Supp. 1179 (E.D.Wis.1973) (general relief applicant); *Neddo v. Housing Authority of Milwaukee*, 335 F.Supp. 1397 (E.D.Wis.1971) (public housing applicant); *Custom v. Trainor*, 74 F.R.D. 409 (N.D.Ill.1977) (general assistance applicants).

**36.** Although *Ferguson* and *Watkins* involved *termination* of certificates of family participation in a Section 8 subprogram, a similar analysis applies to the *denial* of housing assistance payments in the first instance. In *Wright v. Califano*, 587 F.2d 345, 354 (7th Cir. 1978), this court concluded that "denials [of benefits] do not necessarily deserve less due process than terminations."

**37.** The district court stated:

HUD argues that a property interest in Section 8 benefits does not arise until the owner certifies a family as eligible to receive such benefits. Prior to certification, HUD contends that the plaintiffs have an inchoate property interest, which is merely a subjective expectancy not entitled to any due process protection. I agree.

*Holbrook v. Pitt*, 479 F.Supp. at 994.

**38.** Future tenants obviously have a legitimate claim of entitlement only with respect to benefits for the months during which they rented units.

non-certified tenants do not have a legitimate claim of entitlement under the due process clause. *But see Ressler v. Landrieu*, No. A77–228C (D.Alas. March 6, 1980).

The district court relied on Judge Hufstedler's dissent in *Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d at 494–96, in support of the proposition that neither Congress nor HUD has "manifested an intention 'to create a governmental obligation' to tenants who have not been certified as eligible to receive section 8 benefits." *Holbrook v. Pitt*, 479 F.Supp. at 995.

The claim of entitlement rejected by Judge Hufstedler in *Geneva Towers* and by this court in *Harlib v. Lynn*, 511 F.2d 51 (7th Cir. 1975), involved a rent increase in a housing project subsidized under Section 221(d)(3), which created an assistance program similar to the Section 8 program. In determining that Section 221(d)(3) did not create an entitlement *to a certain rent level*, Judge Hufstedler emphasized that Congress did not "gear rent levels to the budgets of individual tenants" but, instead, authorized the Secretary to set rent levels based upon several factors. She also noted that Section 221(d)(3) was not enacted as a direct financial assistance program for tenants and that the program was directed more "to benefiting the class of low and middle income housing consumers than it [was] to benefiting any specific tenants." *Geneva Towers*, 504 F.2d at 497.

But this analysis, which also underlies *Harlib*, supports rather than contradicts the existence of a legitimate claim of entitlement in the instant case. Here the rent subsidies are fashioned to fit the budgets of individual tenants. Section 8 was designed to benefit *specific* tenants by providing them with monthly rental subsidies meeting their particularized needs. Once a family is selected to receive Section 8 assistance, the only factors that determine the level of assistance the family is to receive are the monthly rental charge for the unit and the family's financial circumstances. Thus, in contrast to the Section 221(d)(3) program, award of Section 8 benefits is geared to the rental assistance needs of particular tenants.[39]

The existence of owner discretion in the certification process does not suggest a different conclusion. Although the owner may have limited discretion with regard to the initial selection of tenants who are to be subsidized under the Contracts, *see* note 12, *supra*, the owner may properly exercise no discretion with regard to retroactive certification, *see* pages 1274–76 *supra*. Indeed, it is the apparent decision by HUD to give owners the unreviewable right to decide whether a certified tenant will receive retroactive benefits that offends the concepts of fairness and nonarbitrariness which are at the heart of the constitutional requirement of due process of law.

### 3. *What Process is Due?*

Since appellants have a legitimate claim of entitlement to retroactive housing

---

**39.** Judge Hufstedler determined that a governmentally conferred benefit constitutes a constitutionally cognizable claim of entitlement if the initial receipt or the termination of the benefit is conditioned on the "existence of a controvertible and controverted fact." *Geneva Towers*, 504 F.2d at 495. This requirement "serves the practical side of due process, since a hearing and notice would be 'pointless' if there were no such facts to resolve." *Uneeda Davis v. Ball Memorial Hospital Association*, 640 F.2d 30, at 41 (7th Cir. 1980).

In the present case, it is clear that appellants have an entitlement claim under Judge Hufstedler's definition. Since they are certified, their eligibility to receive Section 8 benefits has been established, and their owners have selected them specifically as the tenants who are to receive payments under the Contracts. Also, by the terms of the Contracts, HUD has already committed sufficient funds to provide assistance payments to the tenants from the effective dates of the Contracts. The tenants' receipt of retroactive benefits is therefore conditioned solely upon the owners' certification of the tenants for retroactive benefits (and we have held, in effect, that this retroactive certification cannot properly be withheld). The single factual determination that may be required, therefore, is whether, during the period for which the retroactive benefits would be paid, the tenants' incomes exceeded the maximum income limits set forth in the statute, 42 U.S.C. § 1437f(c)(4), 1437f(f)(1) (1976), and in the regulations, 24 C.F.R. § 886.102, 886.109, and 886.117 (1980).

assistance payments, we must remand to the district court to determine what process may be due. Due process does not have a fixed content unrelated to time, place and circumstances. *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Instead, it is a flexible concept that requires such procedural protections as the particular situation demands. *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). As the Supreme Court has emphasized:

> The function of the legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.

*Greenholtz*, 442 U.S. at 13, 99 S.Ct. at 2107 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).

To determine what process is appropriate, the countervailing interests of appellants and HUD must be balanced.[40]

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, includ-

ing the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).[41]

The hardship upon tenants here consists in their being deprived, in their necessitous circumstances, of housing assistance benefits for periods as long as seven months. In this regard, the Supreme Court has recognized that "the possible length of wrongful deprivation of ... benefits is an important factor in assessing the impact of official action on the private interests." *Mathews*, 424 U.S. at 341, 96 S.Ct. at 905 (citing *Fusari v. Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975)).

On the other hand, the fiscal and administrative burdens of elaborate procedural requirements could become relatively onerous in comparison with the private interests sought to be benefited. In this case, however, the burden of providing procedural safeguards regarding the provision of retroactive payments to already certified tenants would appear to be insubstantial. We note that HUD has already provided notice, hearing and appeal procedures for applicants under Section 8 subprograms that involve public housing authorities. *See, e. g.,* 24 C.F.R. § 881.603(b)(3) (1980) (substantially rehabilitated housing). *See also Ressler v. Landrieu*, No. A77–228 (D.Alas. November 21, 1980) (requiring HUD to establish tenant selection standards, waiting lists, and notice, hearing and review procedures with regard to the selection of tenants to be certified under the Section 8 subprogram for projects with HUD-insured mortgages).

It is a *sine qua non* that all tenants receive prompt notification of their right to receive such payments retroactively. *See*

---

40. *See, e. g., Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975); *Carey v. Quern*, 588 F.2d 230, 232 (7th Cir. 1978); *Winston v. United States Postal Service*, 585 F.2d 198, 209 (7th Cir. 1978); *Klein v. Mathews*, 430 F.Supp. 1005, 1008 (D.N.J.1977).

41. *Accord, Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Winston v. United States Postal Service*, 585 F.2d 198, 200 (7th Cir. 1978).

*Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). Due process would also seem to require that the tenants receive a written statement setting forth the reasons for any denial of retroactive benefits and the opportunity to challenge the sufficiency of HUD's reasons. *See Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); *T. A. Moynahan Properties, Inc. v. Lancaster Village Cooperative, Inc.*, 496 F.2d 1114, 1118 (7th Cir. 1974); *Brezina v. Dowdall*, 472 F.Supp. 82, 85 (N.D.Ill.1979). In addition, appellants must receive some sort of hearing before retroactive benefits are finally denied, since the "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. at 901 (citing *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). *See also Memphis Light, Gas & Water Division v. Craft*, 436 U.S. at 16, 98 S.Ct. at 1564. On remand, the district court should determine the precise contours of the requirements of procedural due process in the context of this case, giving whatever regard is appropriate to the contract remedy we have provided to presently certified tenants.[42]

REVERSED and REMANDED for further proceedings in accordance with this opinion.

---

**42.** On remand, the district court may also decide to fashion due process protection for tenants who will be certified in the future. *See* note 31, *supra*.